UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
M&K IMPORTS, LLC,                                    :
                          Plaintiff,                 :
                                                     :
v.                                                   :          __OPINION AND ORDER__
                                                     :
REJUVENEDA MEDICAL GROUP, INC.,                      :          22 CV 2606 (VB)
d/b/a Regeneveda; THOM E. LOBE; PATRICK             :
D. CROCKER; and CROCKER LAW FIRM                     :
PLLC a/k/a Crocker & Crocker,                        :
                          Defendants.                :
----------------------------------------------------------------x

Briccetti, J.:

Plaintiff M&K Imports, LLC, brings this action against defendants Rejuveneda Medical

Group, Inc., d/b/a/ Regeneveda ("Regeneveda"), Thom E. Lobe, Patrick D. Crocker, and Crocker

Law Firm PLLC, asserting claims for breach of contract and aiding and abetting breach of

fiduciary duty against Regeneveda and Lobe (the "Seller Defendants"); negligence, breach of

fiduciary duty, and breach of escrow agreement against Crocker and Crocker Law Firm

(together, the "Crocker Defendants"); and conversion against all defendants.

Now pending is the Seller Defendants' partial motion to dismiss the amended complaint

("Amended Complaint" or Am. Compl.") under Rule 12(b)(6).  (Doc. #44 ("Def. Mot.")).

For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN

PART.

The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

## BACKGROUND

For the purpose of ruling on the motion to dismiss, the Court accepts as true all well-

pleaded allegations in the Amended Complaint and draws all reasonable inferences in plaintiff's

favor, as summarized below.

1

Plaintiff alleges Regeneveda is a corporation wholly owned, operated, and directed by Lobe, a doctor.  Lobe allegedly operates Regeneveda as his alter ego by conducting his medical practice and personal business through Regeneveda, but fails to capitalize Regeneveda sufficiently to meet its debts and obligations.

Plaintiff alleges it and Regeneveda, represented by Lobe, entered into a Supply Purchase Agreement (Doc. #39-1 (the "Original SPA")) on January 13, 2022.  Pursuant to the Original SPA, Regeneveda agreed to supply plaintiff with four million Flowflex COVID-19 at-home antigen tests (the "Tests") in exchange for $23.6 million.  Plaintiff further alleges it separately agreed to resell the Tests, once procured, to the City of New York (the "City").

The Original SPA established the following commitments:  (i) Regeneveda would deliver two million tests by January 21, 2022, and the remaining two million tests by January 24, 2022; (ii) plaintiff would pay a deposit of $7.08 million (thirty percent of the contract price) by January 14, 2022 (the "Deposit"); (iii) the Deposit would be paid to escrow agent Crocker, who would deposit it into his IOLTA account (the "Escrow Account"); and (iv) plaintiff would pay the remaining seventy percent of the contract price "upon receipt of a valid and acceptable SGS inspection report covering the Tests, or 'upon satisfactory inspection and transfer of the goods.'" (Am. Compl. ¶ 34).  The Original SPA also provided:

> [I]f [Regeneveda ]has not produced any documentation of an airway bill or confirmation of shipment no later than January 20, 2022 . . . [t]he 30% deposit will be returned into [plaintiff's] account no later than January 21, 202[2].  If the 30% deposit has not been returned before January 21, 2022 the amount will accrued at a 1.5% interest per day until funds are fully returned back into [plaintiff's] account.

(Id. Ex. A, ¶ 8.2).

Plaintiff contends it wired the Deposit to the Escrow Account on January 14, 2022. Thereafter, plaintiff allegedly never received "an airway bill, confirmation of shipment, or SGS

inspection report as required under the Original SPA.  As such, the Deposit should have been returned" to plaintiff "and no funds should have been released from the Escrow Account except back to" plaintiff.  (Am. Compl. ¶ 36).  Nevertheless, plaintiff alleges that, unbeknownst to it, on January 18, 2022, Crocker disbursed $6.2 million of the Deposit from the Escrow Account to Regeneveda's Chinese supplier, even though plaintiff did not give Crocker or Lobe authority to release the funds.  According to plaintiff, Crocker stated he released the funds based on instructions from Lobe and Regeneveda, among others.

On January 20, 2022, Lobe allegedly sent plaintiff a letter of assurance stating the Tests would be delivered between January 25 and 26, 2022.  According to the Amended Complaint, two days later, plaintiff and Regeneveda entered into an Amended Supply Purchase Agreement (the "Amended SPA"), which:  (i) required delivery of the Tests between January 25 and 26, 2022; (ii) acknowledged Crocker's receipt of the earlier $7.08 million Deposit; (iii) "did not disclose that Defendants had improperly released $6.2 million of those funds from the Escrow Account" (id. ¶ 42); and (iv) required plaintiff to pay an additional $11.8 million to the Escrow Account on January 24, 2022.  On January 24, 2022, plaintiff made the $11.8 million additional payment, but never received the requisite documentation.  Finally, on January 31, 2022, Lobe wrote Crocker requesting that he return the $11.8 million additional payment to plaintiff, and Crocker complied.

On February 3, 2022, given the delays, the City cancelled its order of the Tests from plaintiff.  The next day, plaintiff advised Regeneveda of the City's cancellation and demanded an immediate return of the Deposit.  Thereafter, Lobe directed Crocker to return $750,000 to plaintiff.  However, plaintiff alleges on March 8, 2022, it learned for the first time, through an email from Crocker, that Crocker had disbursed $6.2 million from the Escrow Account to

Regeneveda's supplier on January 18, 2022.

On March 10, 2022, the Crocker Defendants wired plaintiff the Escrow Account balance of $130,000.  According to plaintiff, $6.2 million of the Deposit has not been returned.

**DISCUSSION**

I.    Rule 12(b)(6) Standard of Review

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).[1]  First, a plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and thus are not sufficient to withstand a motion to dismiss.  Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010).  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the complaint's allegations must meet a standard of "plausibility."  Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6),

---

[1]     Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

II.     Breach of Contract Claim Against Lobe

The Seller Defendants argue plaintiff's breach of contract claim against defendant Lobe must be dismissed because plaintiff has failed adequately to plead facts from which the Court can pierce the corporate veil and hold Lobe liable for Regeneveda's actions.

The Court agrees.

A.      Legal Standard

"Under the New York choice of law principles[,] the law of the state of incorporation determines when the corporate form will be pierced."[2] Sonnenblick-Goldman Corp. v. ITT Corp., 912 F. Supp. 85, 88–89 (S.D.N.Y. 1996).  The parties agree Regeneveda was organized in California, so California law controls:

> California law recognizes an alter ego relationship, such that a corporation's liabilities may be imposed on an individual, only when two conditions are met:  (1) there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased, and (2) an adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice.

S.E.C. v. Hickey, 322 F.3d 1123, 1128 (9th Cir. 2003).

For the first condition, there "are no bright-line rules, but there are several factors that courts consider in this analysis, including the commingling of funds, diversion of assets, failure

---

[2]     Although the Original SPA provides that the contract is subject to Chinese law, the issue of whether Regeneveda's corporate veil should be pierced is not within the scope of the choice-of-law provision.  See Standtex Int'l Corp. v. QCP, Inc., 2017 WL 481447, at *4 (S.D.N.Y. Feb. 6, 2017) (Pursuant to New York choice-of-law rules, "even where a contract between the parties suggests otherwise:  The law of the state of incorporation applies to the veil-piercing analysis even if there is a choice-of-law provision in a contract that governs the relationship between the parties.").  Plaintiff and the Seller Defendants agree.

to follow corporate formalities, and the ownership structure of the entities."  Yoo v. Safeco Ins.
Co. of Am., 2022 WL 2704048, at *2 (N.D. Cal. July 12, 2022); see Zoran Corp. v. Chen, 110
Cal. Rptr. 3d 597, 607 (Cal. Ct. App. 2010) (listing many potentially relevant factors).  "No
single factor is determinative, and instead a court must examine all the circumstances to
determine whether to apply the doctrine."  Zoran Corp. v. Chen, 110 Cal. Rptr. 3d at 607.

      For the second condition, "California courts generally require some evidence of bad faith
conduct on the part of defendants before concluding that an inequitable result justifies an alter
ego finding."  Neilson v. Union Bank of Cal., N.A., 290 F. Supp.2d 1101, 1117 (N.D. Cal.
2003).

      "Conclusory allegations of alter ego status are insufficient to state a claim.  Rather, a
plaintiff must allege specifically both of the elements of alter ego liability, as well as facts
supporting each."  Neilson v. Union Bank of Cal., N.A., 290 F. Supp. at 1116.  "Sole ownership
of a company alone is not a sufficient basis for alter ego liability."  Carlson v. Clapper, 2019 WL
2211196, at *6 (N.D. Cal. May 22, 2019).

      B.    Application

      Here, plaintiff has not alleged facts plausibly demonstrating the requisite unity of interest.
Plaintiff's allegations about Lobe's involvement with the corporation can be summarized as
follows:  Lobe controls and directs all of Regeneveda's activities, and conducts his medical
practice and personal business through Regeneveda; the "ABOUT US" tab on Regeneveda's
website only describes Lobe and his medical practice (Am. Compl. ¶ 74); and Lobe, directly or
through his agents, directed disbursements of plaintiff's Deposit out of the Escrow Account.

      These allegations describe Lobe as acting on behalf of and representing Regeneveda.
Leek v. Cooper, 125 Cal. Rptr. 3d 56,  68 (Cal. Ct. App. 2011) ("An allegation that a person

6

owns all of the corporate stock and makes all of the management decisions is insufficient to cause the court to disregard the corporate entity.").  Further, these allegations are consistent with Lobe being the sole owner of the corporation and are not sufficient to plead alter ego liability.  In line with the rationale for sole proprietorships, an individual owning a corporation, like Lobe owning Regeneveda, "is a valid legal entity used to protect the owner from the corporation's debts and liabilities.  It is, therefore, illogical to find that one's status as the sole proprietor [or owner] supports an inference of alter-ego liability."  See Johnston v. Irontown Hous. Co., Inc., 2014 WL 12531189, at *6 (S.D. Cal. Dec. 9, 2014) .  Accordingly, these facts, without more, are insufficient to allege the requisite unity of interest and ownership to state a veil piercing claim.

Regarding the second condition, plaintiff conflates Lobe's actions in allegedly misdirecting plaintiff's Deposit funds with the undercapitalization of Regeneveda.

Allegations that a defendant undercapitalized an alleged alter ego are potentially sufficient to state a veil piercing claim if they allege "a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts," Automotriz Del Golfo De Cal. S.A. De C.V. v. Resnick, 306 P.2d 1, 4 (Cal. 1957) (en banc).  However, here, plaintiff has not alleged facts from which the Court can reasonably infer Regeneveda is undercapitalized.  Plaintiff alleges Lobe "acted beyond any legitimate corporate authority to direct" the Crocker Defendants to release the Deposit, this "wrongful and illegal direction specifically caused Regeneveda to be unable to return the funds to Plaintiff," and Regeneveda therefore "lacks the financial ability to repay" the funds.  (Doc. #48 "Pl. Opp." at 11).  However, allegations that Regeneveda has not paid plaintiff do not necessarily suggest Regeneveda is insolvent.

In addition, plaintiff attempts to allege undercapitalization by saying:

Notwithstanding Lobe's conduct of multi-million dollar transactions through Regeneveda as his <u>alter ego</u>, Lobe has failed to capitalize Regeneveda with sufficient funds to meet its obligation.  Lobe caused Regeneveda to be organized and carry on the business at issue without substantial capital in such a way that Regeneveda in fact does not have sufficient assets available to meet its debts.  Upon information and belief, Regeneveda's <u>capital is both illusory and trifling compared with the business to be done and the risks of loss, and constitutes grounds for denying the separate entity privilege.</u>  Under such circumstances, it is inequitable that Lobe should be allowed to use Regeneveda to escape personal liability.  Lobe's attempt to do business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and is ineffectual to exempt the sole shareholder (Lobe) from corporate debts.

(Am. Compl. ¶ 87 (emphasis added)).  Further, plaintiff argues "<u>if</u> [Lobe's] wrongful acts are treated as those of the corporation alone, an inequitable result will follow."  (<u>Id</u>. ¶ 88).  However, these allegations amount to a recitation of the elements identified by the California Supreme Court as relevant to a veil piercing analysis.  See <u>Automotriz Del Golfo De Cal. S.A. De C.V. v. Resnick</u>, 306 P.2d at 4 ("If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.").  But these allegations do not meet plaintiff's burden, even drawing all reasonable inferences in its favor. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."); <u>see, e.g.</u>, <u>Sandoval v. Ali</u>, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014) ("Not only are Plaintiffs' allegations 'on information and belief' about a unity of interest between all Defendants conclusory, but Plaintiffs have also not adequately alleged that inequity would result from respecting the corporate form of Defendants.").

Accordingly, the Court concludes plaintiff has not plausibly alleged facts supporting a piercing of Regeneveda's corporate veil such that Lobe may be held personally liable for breach of contract.  Plaintiff's breach of contract claim against Lobe must therefore be dismissed.

III.   Conversion Claim

The Seller Defendants argue plaintiff's conversion claim against them must be dismissed because plaintiff has not plausibly alleged they wrongfully took or detained plaintiff's funds.

The Court disagrees.

A.   Legal Standard

Under New York law, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." Colavito v. N.Y. Organ Donor Network, Inc., 8 N.Y.3d 43, 49–50 (2006).  To state a claim for conversion, a plaintiff must allege:  "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." Kirschner v. Bennett, 648 F. Supp. 2d 525, 540 (S.D.N.Y. 2009).  "Money may be the subject of a conversion action only if it is specifically identifiable and segregated and there exists an obligation to return or otherwise treat in a particular manner the specific fund in question." In re Columbia Tuition Refund Action, 523 F. Supp. 3d 414, 430–31 (S.D.N.Y. 2021).  Further, if "the conduct the plaintiff seeks to recover for amounts to the destruction or taking of the property, then the action is properly deemed one for conversion." Sporn v. MCA Records, Inc., 58 N.Y.2d 482, 488 (1983) (emphasis added).

B.   Application

At this early stage, plaintiff has plausibly alleged the Seller Defendants exercised control over the Crocker Defendants, such that the Seller Defendants had dominion over the Deposit and effected the allegedly tortious disbursement thereof.

Plaintiff's conversion claim is premised on the Crocker Defendants' allegedly wrongful disbursement of $6.2 million of the Deposit to the Seller Defendants' supplier in China.  Plaintiff alleges that, on January 14, 2022, it wired $7.08 million to Crocker as escrow agent under the Original SPA, which was to be held in the Escrow Account until either (i) shipping documentation was provided to plaintiff, in which case the Deposit would be disbursed to the Seller Defendants, or (ii) if by January 20, 2022, the Seller Defendants had not provided the shipping documentation, the Deposit would be returned to plaintiff.  (Am. Compl. ¶ 95).  Plaintiff further alleges, on January 18, 2022, the Crocker Defendants disbursed $6.2 million of the Deposit to the Seller Defendants' Chinese supplier, which Crocker allegedly did "based upon the 'specific instructions' from and the 'agreements' with Lobe and Regeneveda, and others (presumably [the supplier])," but without authorization from plaintiff or providing the requisite shipping documentation to plaintiff.  (Id. ¶ 105; see also id. ¶ 90).  Finally, plaintiff alleges Lobe and Regeneveda delayed informing plaintiff about this allegedly improper disbursement and instead kept assuring plaintiff that a return of the Deposit to plaintiff was forthcoming.

Although plaintiff has not alleged the Seller Defendants had physical possession of the Deposit funds, drawing all reasonable inferences in plaintiff's favor, the Court concludes plaintiff has plausibly alleged the Seller Defendants instructed the Crocker Defendants to improperly release the Deposit to a third party, thereby exercising dominion over the Crocker Defendants' Escrow Account and the release of plaintiff's Deposit therefrom.  See, e.g., Grocery Delivery E-Servs. USA, Inc. v. Flynn, 201 A.D.3d 585, 586 (1st Dep't 2022) (allegations "that the proceeds paid by the insurance company to [a nonparty] for plaintiff's claim constitutes a specific, identifiable fund, that plaintiff has a superior right of possession to the fund, and that defendant interfered with plaintiff's right of possession").

Further, the Court finds plaintiff's conversion claim is not duplicative of its breach of contract claim.  Generally, "for a claim of conversion to survive a motion to dismiss, it is not enough merely to incorporate the factual allegations relating to breach of contract."  Flatscher v. The Manhattan Sch. of Music, 551 F. Supp. 3d 273, 288 (S.D.N.Y. 2021).  "Rather, a conversion claim may only succeed if a plaintiff alleges wrongs and damages distinct from those predicated on a breach of contract."  Id.

Here, the Court concludes plaintiff's conversion claim against the Seller Defendants is premised on distinct facts, and seeks distinct damages, from plaintiff's breach of contract claim against them.  The breach of contract claim is based on the Seller Defendants' alleged failure to deliver the Tests as contemplated by the Original SPA and to return the Deposit.  Plaintiff's conversion claim, however, is based on the Seller Defendants' alleged wrongful disbursement of plaintiff's Deposit to their supplier, through the Crocker Defendants.

Regarding damages, plaintiff seeks at least $11.45 million on the breach of contract claim from the Seller Defendants.  On the conversion claim, plaintiff seeks $6.2 million, jointly and severally against all defendants, as well as at least $10 million in punitive damages against all defendants.  "[I]f the plaintiff can recover punitive damages under a conversion claim and cannot recover punitive damages under a breach of contract claim, then the punitive damages constitute unique recovery under the conversion claim and the claim is not duplicative of the breach of contract claim."  Westcon Grp., Inc., v. CCC Techs., Inc., 2022 WL 4134578, at *5 (S.D.N.Y. Sept. 12, 2022).  Here, drawing all reasonable inferences in plaintiff's favor, its allegations that the Seller Defendants directed the Crocker Defendants to release $6.2 million to the Seller Defendants' supplier, without plaintiff's consent and even though the Seller Defendants did not comply with their contractual obligation to return these funds to plaintiff if they failed to provide

11

the necessary documentation, are sufficient, if true, to support a potential recovery of punitive

damages.  See id. (punitive damages award requires proof a defendant acted maliciously or

recklessly).

Thus, plaintiff's conversion claim against the Seller Defendants is premised on distinct

facts and seeks distinct damages, and therefore is not duplicative of the breach of contract claim.

IV.    Aiding and Abetting Breach of Fiduciary Duty Claim

The Seller Defendants argue plaintiff's claim against them for aiding and abetting the

Crocker Defendants' breach of fiduciary duty must be dismissed because plaintiff does not

plausibly allege the Seller Defendants knowingly induced or participated in the breach.

The Court disagrees.

A.    Legal Standard

To state a claim for breach of fiduciary duty, a plaintiff must allege "(1) the existence of

a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the

defendant's misconduct."  Varveris v. Zacharakos, 110 A.D.3d 1059, 1059 (2d Dep't 2013).  To

proceed on an aiding and abetting theory, a plaintiff must allege "(1) a breach by a fiduciary of

obligations to another; (2) the defendant's knowing inducement of or participation in the breach;

and (3) damages suffered by the plaintiff from the breach."  Catskill Dev., L.L.C. v. Park Place

Ent. Corp., 547 F.3d 115, 134 (2d Cir. 2008).  "To have knowingly participated in a breach of

fiduciary duty, a defendant must have provided substantial assistance to the primary violator."

Sheehy v. New Century Mortg. Corp., 690 F. Supp. 2d 51, 70 (E.D.N.Y 2010) (quoting

Kaufman v. Cohen, 307 A.D.2d 113, 126 (1st Dep't 2003)).  Substantial assistance requires that

the alleged aider and abettor (i) "affirmatively assists, helps conceal or fails to act when required

to do so, thereby enabling the breach to occur," and (ii) "proximately caused the harm on which

the primary liability is predicated such that plaintiff's injury was a direct or reasonably foreseeable result of the conduct." Id.

"A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 19 (2005) (quoting Restatement (Second) of Torts § 874, cmt. a). Fiduciary relationships are "grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions." Id. It is "settled law that an escrow agent owes his or her beneficiary a fiduciary duty." Talansky v. Schulman, 2 A.D.3d 355, 359 (1st Dep't 2003). "Under New York law, an escrow agreement creates a fiduciary relationship between the escrow agent and the parties to the escrow transaction." Pan-Am. Life Ins. Co. v. Antarctica Cap. Mgmt., LLC, 2022 WL 992840, at *5 (S.D.N.Y. Mar. 31, 2022).

B.    Application

Here, the Seller Defendants do not dispute that plaintiff plausibly alleges the Crocker Defendants breached their fiduciary duty or that plaintiff suffered damages. They only dispute whether plaintiff plausibly alleges the Seller Defendants knowingly induced or participated in the breach.

According to plaintiff, Crocker stated he disbursed the Deposit to a party other than plaintiff on instructions from Lobe and Regeneveda. Drawing all reasonable inferences in plaintiff's favor, and in light of the allegations that the contract required Regeneveda to give plaintiff certain documentation before additional funds would be disbursed, that Regeneveda failed to do so by the deadline, and that Lobe nevertheless directed Crocker to release the funds, it is plausible the Seller Defendants knowingly induced the Crocker Defendants' breach of

13

fiduciary duty by instructing them to release the Deposit without plaintiff's authorization, and then concealed the occurrence of the breach by not informing plaintiff of the disbursement for almost two months.

Further, at this early stage of the litigation, without the details of those interactions between the Seller Defendants and the Crocker Defendants, the Court cannot conclude whether Lobe's actions (if any) in allegedly instructing the release of these funds were taken on behalf of Regeneveda, or whether he acted in his individual capacity.  See N. Shore Architectural Stone, Inc. v. Am. Artisan Constr. Inc., 153 A.D.3d 1420, 1421 (2d Dep't 2017) ("[A] corporate officer who participates in the commission of a tort may be held individually liable, regardless of whether the officer acted on behalf of the corporation in the course of official duties and regardless of whether the corporate veil is pierced.").  Accordingly, plaintiff's claims against the Seller Defendants for aiding and abetting breach of fiduciary duty may proceed.

**CONCLUSION**

The motion to dismiss is GRANTED IN PART and DENIED IN PART.  Plaintiff's

breach of contract claim against Lobe is dismissed.  All of plaintiff's other claims against the

Seller Defendants may proceed.

The Seller Defendants shall file an answer by January 25, 2023.

The case management conference scheduled for April 19, 2023, at 9:30 a.m., at the White

Plains Courthouse, Courtroom 620, shall proceed as scheduled.

The Clerk is instructed terminate the motion.  (Doc. #44).

Dated:  January 11, 2023
         White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge