UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
M&K IMPORTS, LLC,                          :
          Plaintiff,                 :
                            :    **OPINION AND ORDER**
v.                                          :
                            :    22 CV 2606 (VB)
REJUVENEDA MEDICAL GROUP, INC.,            :
d/b/a Regeneveda; THOM E. LOBE; PATRICK    :
D. CROCKER; and CROCKER LAW FIRM           :
PLLC a/k/a Crocker & Crocker,              :
          Defendants.                :
------------------------------------------------------------x

Briccetti, J.:

Plaintiff M&K Imports, LLC ("plaintiff" or "M&K"), brings this action against defendants Rejuveneda Medical Group, Inc., d/b/a Regeneveda ("Regeneveda"), Thom E. Lobe, Patrick D. Crocker, and Crocker Law Firm PLLC. Plaintiff asserts claims (i) against Regeneveda for breach of contract, (ii) against Crocker and Crocker Law Firm, PLLC (the "Crocker Defendants") for breach of fiduciary duty, (iii) against Regeneveda and Lobe for aiding and abetting the Crocker Defendants' breach of fiduciary duty, (iv) against the Crocker Defendants for negligence, and (v) against all defendants for conversion. Regeneveda and Lobe (the "Seller Defendants") also assert a crossclaim for contribution and indemnity against the Crocker Defendants.

Now pending are cross-motions for summary judgment. Plaintiff seeks summary judgment on all claims. (Doc. #183). The Crocker Defendants seek summary judgment on plaintiff's claims for breach of fiduciary duty, negligence, and conversion, as well as on the Seller Defendants' cross-claim for contribution and indemnity. (Doc. #188).

For the reasons set forth below, plaintiff's motion is GRANTED IN PART and DENIED IN PART, and the Crocker Defendants' motion is GRANTED IN PART and DENIED IN PART.

1

The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

## BACKGROUND

The parties have submitted briefs, declarations with exhibits, and statements of material facts pursuant to Local Civil Rule 56.1.[1]  These submissions reflect the following factual background.

This case arises from a series of transactions involving plaintiff's attempted purchase and resale of Covid-19 test kits.  In January 2022, M&K's President, Keith Del Valle, together with a non-party vendor, procured a purchase order from the City of New York (the "City") through which the City would purchase four million Covid-19 test kits for $34,960,000.  In efforts to source the test kits, Del Valle came into contact with Christopher Listo.[2]  Listo connected Del Valle with Dr. Thom E. Lobe, the President and sole shareholder of Regeneveda.  Regeneveda advised plaintiff it could timely source the test kits for its transaction with the City.  (Doc. #184–6 at ¶ 74).

On January 14, 2022, plaintiff and Regeneveda entered into a Supply Purchase Agreement (the "Original SPA").  (Doc. #184–9).  Although Listo was not a Regeneveda employee, he coordinated the transaction.  The Original SPA established the following

---

[1]    Regeneveda did not submit a counterstatement pursuant to Local Civil Rule 56.1(b); therefore, the Court deems the facts in plaintiff's Rule 56.1 statement to be undisputed for the purposes of plaintiff's motion for summary judgment against the Seller Defendants.  See Local Civil Rule 56.1(c); (Doc. #186).  Nonetheless, because the Court must be "satisfied that the citation[s] to evidence in the record support[] [plaintiff's] assertion[s]," Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004), it has independently reviewed the factual record with respect to each of plaintiff's statements of material undisputed fact.  Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001).  The Court's review of the record did not reveal any facts to contradict the relevant facts in plaintiff's Rule 56.1 statement.

[2]    Listo is not a party to this action, but plaintiff has sued him in a separate case before this Court for his role in the same transactions at issue here.  See M&K Imports, LLC v. Listo, case no. 25-cv-485 (VB).

commitments: (i) Regeneveda would deliver two million tests by January 21, 2022, and an additional two million tests by January 24, 2022, (ii) the total purchase price would be $23.6 million, (iii) plaintiff would pay a "deposit in escrow" of thirty percent of the total purchase price (the "initial deposit") to the Crocker Law Firm PLLC's IOLTA account, and (iv) plaintiff would pay the remaining seventy percent of the contract price upon receipt of an SGS inspection certificate.[3]  (Id.)  Section 8.2 of the Original SPA, titled "Terms of Payment," provided:

> The Parties agree that if the seller has not produced any documentation of an airway bill or confirmation of shipment no later than January 20, 2022.  The 30% deposit will be returned to the buyers account no later than January 21, 202[2].

(Id. at 6).

Plaintiff obtained the funding for the transaction from a private investor, SBC Alliance, LLC ("SBC").  Prior to transferring the funds, Del Valle emailed Crocker to set up "a quick conversation as Escrow Agent for the transaction involving [Regeneveda]."  (Doc. #184–38 at 3–4).  Crocker agreed and provided his phone number.  (Id. at 3).  SBC wired the initial deposit of $7,080,000 directly to Crocker's escrow account on January 14, 2022.

On January 17, 2022, Regeneveda entered into a separate contract with Guangzhou Canchi Trading Co. Ltd. ("Canchi"), a Chinese company, which was formalized in a separate Supply Purchase Agreement (the "Canchi SPA").  (Doc. #195–12).  Under the Canchi SPA, Canchi would supply Regeneveda with four million tests in exchange for $17 million.  An accompanying escrow agreement designated Crocker as the escrow agent for this transaction.  (Doc. #184–41).

---

[3]    SGS is a global company that provides product inspection services.  (Doc. #184–1 at Tr. 182).

On January 18, 2022, Crocker wired $6.2 million of the initial deposit funds to Canchi. Crocker did not advise plaintiff he had released the funds. Plaintiff had not yet received an airway bill or SGS inspection certificate. Crocker retained $880,000 of the initial deposit in the escrow account.

Also on January 18, 2022, Listo forwarded Del Valle a letter from Jamie Banfill, who purported to serve as "transaction counsel" for Canchi. The letter states Canchi had received "the partial prepayment wire" to its bank account. (Doc. #195–9 at 2). The letter further states the shipment of tests was delayed but would be fulfilled by January 23, 2022. On January 20, 2022, Listo forwarded a second letter from Banfill stating the shipment of tests was delayed even further and the "deposit monies" which were wired to China had only recently cleared local bank compliance and regulatory procedures. (Doc. #195–10 at 2).

In light of the delays, on January 23, 2022, plaintiff and Regeneveda executed an amendment to the Original SPA (the "Amended SPA"). (Doc. #184–16). The Amended SPA set a revised schedule for delivery no later than January 26, 2022, and required plaintiff to deposit an additional $11,800,000 into Crocker's escrow account (the "additional deposit"). The Amended SPA also stated:

> Immediately upon acceptance of the SGS and Airway Bill, the Buyer will authorize the Escrow Agent to release funds held in the Escrow Account to Canchi for further payment of the Goods.

(Id. at 2).

SBC wired the additional deposit funds of $11,800,000 to Crocker's escrow account. On January 26, 2022, Crocker confirmed receipt of the additional deposit "as Escrow Attorney" for the transaction. (Doc. #184–43).

4

Regeneveda did not deliver the test kits by January 26, 2022, or any time thereafter. Plaintiff never received an airway bill or SGS inspection certificate.

On January 29, 2022, plaintiff requested the return of the additional deposit funds of $11.8 million. At Lobe's direction, Crocker returned the additional deposit funds to plaintiff.

On February 3, 2022, the City terminated its purchase order with plaintiff due to the delays in delivery. On February 4, 2022, plaintiff sent Regeneveda a notice of contract termination and requested the return of the $7,080,000 initial deposit funds. On March 8, 2022, Crocker informed plaintiff he had released $6.2 million of the initial deposit funds to Canchi on January 18, 2022. Crocker returned the remaining $880,000 to plaintiff.

## DISCUSSION

I.    Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp v. Catrett, 477 U.S. 317, 322 (1986).[4]

A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether

---

[4]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). "[T]he mere existence of a scintilla of evidence" supporting the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for it. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes all facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor, on the issue on which summary judgment is sought, summary judgment is improper. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

In deciding cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration" and need not ultimately "grant judgment as a

matter of law for one side or the other." Hueblein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993).

II.    Breach of Contract Claim

Plaintiff contends it is entitled to summary judgment on its claim against Regeneveda for breach of contract. (Doc. #183). More specifically, plaintiff contends it is entitled to summary judgment on this claim as to both liability and damages. (Doc. #194 at 9–10).

The Court agrees.

A.    Liability

The elements of breach of contract claim under New York[5] law are "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." Orlander v. Staples, Inc., 802 F.3d 289, 294 (2d Cir. 2015).

Here, there is no genuine dispute of material fact as to plaintiff's claim for breach of contract. The Original SPA and the Amended SPA were both enforceable contracts between plaintiff and Regeneveda.[6] (Doc. ##184–9, 184–16). Plaintiff performed when it wired both the

---

[5]    Pursuant to a stipulation by the parties, the Court ordered that all claims and issues asserted or raised in this case shall be governed by New York law. (Doc. #168).

[6]    Regeneveda references another document, the Full Corporate Offer ("FCO"), which it claims is a separate contract between Regeneveda and M&K, and which lists "Joe Brower" as "President/CEO" of M&K. (Doc. #206–1). Regeneveda submitted the FCO without so much as an affidavit of counsel establishing that the document is what it purports to be. (Doc. #206). Further, Mr. Brower—who is not and has never been an employee of M&K—testified he never signed this document and has no idea how his name appears on it as M&K's "President/CEO." (Doc. #184–2 at Tr. 50–51; Doc. #212). To be sure, the Crocker Defendants submitted a "DocuSign Certificate of Completion" for the FCO which they claim Regeneveda produced. (Doc. #203–2; Doc. #204 at 7 n.4.). But, as plaintiff identifies, the DocuSign ID number on this certificate does not match the DocuSign ID number on the FCO. (Doc. #215 at 12 n.9). Accordingly, the Court will not consider the FCO in ruling on the instant motions for summary judgment because it is unauthenticated. Allstate Life Ins. Co. v. Mota, 2022 WL 1606449, at *8 (S.D.N.Y. May 20, 2022). Even assuming authenticity, the FCO would not create a genuine dispute of material fact as to plaintiff's breach of contract claim.

initial deposit and the additional deposit funds.  (Doc. #184–11).  Regeneveda breached the

contract when it failed to deliver the test kits.  It is undisputed plaintiff suffered damages.

Regeneveda seeks to avoid summary judgment on the basis that its performance became

impossible after an "unforeseen government takeover" rendered Canchi unable to deliver the test

kits.  (Doc. #206 at 16).

Under New York law, impossibility is an affirmative defense against liability for breach

of contract.  See Siemens Energy, Inc. v. Petróleos de Venezuela, S.A., 82 F.4th 144, 153 (2d Cir.

2023) (citing Kel Kim Corp. v. Cent. Mkts., Inc., 70 N.Y.2d 900, 902 (1987)).  This affirmative

defense excuses a party's nonperformance when (i) "the destruction of the subject matter of the

contract or the means of performance makes performance objectively impossible," and (ii) the

impossibility was "produced by an unanticipated event that could not have been foreseen or

guarded against in the contract."  Kel Kim Corp. v. Cent. Mkts., Inc., 70 N.Y.2d at 902.

However, the defense does not apply when "impossibility or difficulty of performance is

occasioned only by financial difficulty or economic hardship."  407 East 61st Garage, Inc. v.

Savoy Fifth Ave. Corp., 23 N.Y.2d 275, 281 (1968).  Rather, a defendant must show it "took

virtually every action within its power to perform its duties under the contract, and that, despite

those efforts, performance was objectively impossible."  Siemens Energy, Inc. v. Petróleos de

Venezuela, S.A., 82 F.4th at 154.  This defense "should be applied narrowly and only in extreme

circumstances."  Sher v. Allstate Ins. Co., 947 F. Supp. 2d 370, 383 (S.D.N.Y. 2013) (citing Kel

Kim Corp. v. Cent. Mkts., Inc., 70 N.Y.2d at 900).

Even assuming Regeneveda's assertions regarding Canchi are true, Regeneveda is in no

way released from its contractual duties.  In fact, the Amended SPA clearly contemplated

Canchi's failure to perform.  The Amended SPA states performance failures by Canchi "may

negatively impact Delivery . . . and result in excusable delays" by Regeneveda.  (Doc. #184–16 at 2).  But Regeneveda's total failure to perform is far from an excusable delay.  Moreover, it is undisputed Regeneveda made no attempts to source the test kits from another supplier, and thus it cannot show it "took virtually every action within its power to perform its duties under the contract, and that, despite those efforts, performance was objectively impossible."  Siemens Energy, Inc. v. Petróleos de Venezuela, S.A., 82 F.4th at 154.  Accordingly, Regeneveda's nonperformance is not excused by impossibility.

Because no genuine dispute of material fact exists and Regeneveda has failed to raise a meritorious defense, plaintiff is entitled to summary judgment on its breach of contract claim.

B.    Damages

Plaintiff also seeks summary judgment as to damages.  (Doc. #194 at 9–10).  Specifically, plaintiff seeks an award of (i) general damages in the amount of $6,200,000 representing the remaining amount of the initial deposit which has not been returned, and (ii) consequential damages in the amount of $11,360,000 representing lost profits from its deal with the City.  (Id.).

Regeneveda fails to contest or respond to plaintiff's damages arguments.  (See generally Doc. #206).  Accordingly, the Court may rely on plaintiff's uncontested damages calculation in deciding the motion for summary judgment.  See HVT, Inc. v. Port Auth. of N.Y. and N.J., 2018 WL 3134414, at *15 (E.D.N.Y. Feb. 15, 2018); Prospect Cap. Corp. v. Credito Real USA Fin. LLC, 702 F. Supp. 3d 178, 192–93 (S.D.N.Y. 2023).  Indeed, after an independent review of the record, the Court agrees plaintiff is entitled to summary judgment on damages.

First, as to general damages, "[i]t has long been established in New York that a breaching party is liable for all direct and proximate damages which result from the breach."  Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 110 (2d Cir. 2007).  When the buyer

is the nonbreaching party and decides to cancel a purchase, "New York law—as well as common sense—requires that the seller must return the buyer's deposit in full." Rella v. N. Atl. Marine, Ltd., 2004 WL 1418021, at *5 (S.D.N.Y. June 23, 2004).

Here, it is undisputed that on January 14, 2022, plaintiff deposited $7,080,000 into the Crocker Law Firm PLLC escrow pursuant to the contract. (Doc. #186 at 10). This deposit represented thirty percent of the total contract price. (Doc. #184–9 at 6). It is also undisputed that Regeneveda failed to return $6,200,000 of that deposit. (Doc. #186 at 20). Thus, plaintiff is entitled to an award of general damages in the amount of $6,200,000.

Second, as to consequential damages, "the party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made." Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y., 10 N.Y.3d 187, 192–93 (2008). With respect to lost profits, plaintiff must show (i) its loss was caused by the breach, (ii) the extent of its loss "is capable of proof with reasonably certainty," and (iii) the damages were "fairly within the contemplation of the parties." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d at 109. In determining whether damages were contemplated by the parties, "the court must take a 'common sense' approach, and determine what the parties intended by considering 'the nature, purpose, and particular circumstances of the contract known by the parties as well as what liability the defendant fairly may be supposed to assumed consciously.'" Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000) (quoting Kenford Co., Inc. v. County of Erie, 73 N.Y.2d 312, 319 (1989)).

Here, there is no genuine dispute of material fact as to plaintiff's claim for lost profits. Plaintiff contracted with Regeneveda to purchase four million Covid-19 test kits for $23,600,000. (Docs. ## 184–9, 184–16). Plaintiff entered into this transaction with Regenevada

10

in order to source test kits for a separate purchase order with the City of New York. (Doc. #184–7). Under that purchase order, the City would have paid plaintiff $34,960,000. (Id.). However, after Regeneveda's breach, the City informed plaintiff it was terminating the purchase order due to the delays in delivery. (Doc. #184–29 at 2). Accordingly, it is undisputed plaintiff would have realized profits of $11,360,000 from the resale of the test kits had Regeneveda not breached the contract. It is also undisputed that Regeneveda fairly contemplated these damages, as it advised plaintiff it could timely source the test kits for the deal with the City.[7] (Doc. #184–6 at ¶ 74). Thus, plaintiff is entitled to an award of consequential damages in the amount of $11,360,000.

III.    <u>Breach of Fiduciary Duty Claim</u>

Plaintiff contends it is entitled to summary judgment on its claim against the Crocker Defendants for breach of fiduciary duty because Crocker prematurely released a portion of the initial deposit funds. (Doc. #194 at 30). The Crocker Defendants contend summary judgment in their own favor is proper because Crocker owed no fiduciary duty to plaintiff and, in any event, did not commit any misconduct. (Docs. ##196 at 5–7, 207 at 2–6).

The Court finds neither party is entitled to summary judgment because a genuine dispute of material fact exists as to whether plaintiff authorized or otherwise ratified Crocker's partial transfer of the initial deposit funds.

---

[7]     At oral argument, Regeneveda's counsel asserted for the first time that plaintiff cannot recover damages for lost profits because plaintiff did not in fact have a contract with the City. To be sure, when Del Valle procured the purchase order with the City, he did so through "MCT Pro Tools," a vendor for which he served as Director of Business Development. (Doc. #186 at 3–4). However, it is undisputed that "the entity which would actually source the Test Kits and sell them to the City of New York (through the MCT Pro Tools Purchase Order) would be M&K Imports." (Id. at 4; <u>see also</u> Doc. #184–6 at ¶ 74 (recognizing the City of New York as plaintiff's "client")).

A.    <u>Legal Standard</u>

"The elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." <u>Rut v. Young Adult Inst., Inc.</u>, 74 A.D.3d 776, 777 (2d Dep't 2010).

"An escrow agent owes the parties to the transaction a fiduciary duty, and therefore the agent, as a fiduciary, has a strict obligation to protect the rights of the parties for whom he or she acts as escrowee." <u>Greenapple v. Capital One, N.A.</u>, 92 A.D.3d 548, 549 (1st Dep't 2012).  In other words, the escrow agent "has a duty not to deliver the monies in escrow except upon strict compliance with the conditions imposed by the controlling agreement." <u>Id</u>.

The party asserting the existence of an escrow agreement must show the alleged escrow agent agreed to accept that responsibility. <u>Friedman v. Stern</u>, 1992 WL 58878, at *2 (S.D.N.Y. Mar. 13, 1992).  "In New York, an escrow agreement requires [i] an agreement as to the subject matter and delivery of the same; [ii] a third-party depositary; [iii] delivery of the subject matter to a third party conditioned upon the performance of some act or the happening of the event; and [iv] relinquishment by the promisor." <u>Advanced Oxygen Therapy Inc., v. Orthoserve, Inc.</u>, 572 F. Supp. 3d 26, 36 (S.D.N.Y. 2021).

An escrow agreement is "a contract like any other," and its unambiguous terms will be enforced as written. <u>Pan-Am. Life Ins. Co. v. Antarctica Cap. Mgmt., LLC</u>, 2022 WL 992840, at *5 (S.D.N.Y. Mar. 31, 2022); <u>Bailey v. Fish & Neave</u>, 8 N.Y.3d 523, 528 (2007).  Whether an escrow agreement is ambiguous is an issue for the Court to decide as a matter of law, and "is determined solely by reference to the four corners of the agreement." <u>Wilder v. World of Boxing LLC</u>, 220 F. Supp. 3d 473, 479 (S.D.N.Y. 2016).  "The meaning of an ambiguous agreement, by

contrast, is a question of fact to be determined by the factfinder in the event extrinsic evidence exists of the parties' intentions." Id.; Ermiger v. Black, 36 A.D.3d 1053, 1054 (3d Dep't 2007). "An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation." Piccirilli v. Yonaty, 204 A.D.3d 1332, 1325 (3d Dep't 2022).

B.    Existence of a Fiduciary Relationship

The Crocker Defendants claim they had no fiduciary relationship with plaintiff because they did not have an escrow agreement. Specifically, they argue the Original SPA is not an enforceable escrow agreement because it does not identify a condition upon which the initial deposit funds were to be released. (Doc. #204 at 16); see also Mortg. Elec. Registration Sys., Inc. v. Maniscalco, 46 A.D.3d 1279, 1282 (3d Dep't 2007) ("[I]n order to satisfy the third element of an escrow agreement, there must be some specific act or event which triggers the depositary's duty to deliver funds to a third party.").

Section 8.2 of the Original SPA, titled "Terms of Payment," reads in relevant part:

The Parties agree that if the seller has not produced any documentation of an airway bill or confirmation of shipment no later than January 20, 2022. The 30% deposit will be returned to the buyers account no later than January 21, 202[2].

(Doc. #184–9 at 6) (emphasis added). Further, Section 4.3, titled "Delivery Schedule," makes clear the referenced thirty percent deposit is a "deposit in escrow." (Id. at 5). Read together, this language conditions Crocker's release of the initial deposit funds on Regeneveda's production to plaintiff of an airway bill and confirmation of shipment.

The Crocker Defendants claim the Original SPA "entirely omits any language of an event or condition which triggers the escrow agent's duty to release the funds." (Doc. #207 at 4–5 n.2). To be sure, the Original SPA does not affirmatively authorize the escrow agent to release

13

the deposit funds upon production of an airway bill and confirmation of shipment. But it does

condition the release of the funds on that specific event. Indeed, if the deposit could be released

before Regeneveda's production of the airway bill or shipping confirmation, then Section 8.2,

which is clearly a key provision of the contract, would be rendered meaningless. See Piccirilli v.

Yonaty, 204 A.D.3d at 1324–25 (rejecting an interpretation of an escrow agreement which would

"operate to leave a provision of a contract without force and effect"). Thus, the Original SPA is a

valid escrow agreement.

      Notwithstanding these unambiguous terms, the Crocker Defendants note Crocker did not

sign the Original SPA and argue he did not otherwise agree to serve as escrow agent for the

transaction with plaintiff. (Doc. #204 at 10–15). They claim Crocker agreed to serve as escrow

agent only for the transaction between Regeneveda and Canchi. (Id.)

      This argument is frivolous. Even if Crocker did not sign the Original SPA, New York

courts have recognized that an escrow agreement may be based upon "words or conduct."

Gargano v. Morey, 165 A.D.3d 889, 891 (2d Dep't 2018); Great Am. Ins. Co. v. Canandaigua

Nat. Bank and Tr. Co., 23 A.D.3d 1025, 1027 (4th Dep't 2005). Here, the record demonstrates

Crocker consistently and unequivocally held himself out as escrow attorney for the transaction

involving plaintiff. (Doc. #184–38) (email from Crocker agreeing to meet "for a quick

conversation as Escrow Agent for the transaction involving" plaintiff); (Doc. #184–43) (letter

from Crocker confirming deposit receipt and identifying himself as "Escrow Attorney" for the

transaction involving plaintiff). And even though Crocker did not sign the Original SPA, he had

a role in drafting it[8] and accepted funds in his escrow account pursuant to its terms. See

---

[8]    The parties dispute the extent of Crocker's involvement in drafting the Original SPA.
(Docs. ##194 at 4, 207 at 4–5 n.2). However, it is undisputed that, at the very least, Crocker

Drulcrest PTY, Ltd. V. Jamar Prod. Inc., 1986 WL 4547, at *2–3 (S.D.N.Y. April 11, 1986) (finding it "irrelevant" that escrow agent did not sign agreement because "[b]y accepting monies under the agreement, the escrow agent bound itself to its terms"). No reasonable jury could conclude Crocker did not accept responsibility as escrow agent for the transaction with plaintiff.[9]

Accordingly, the Original SPA is a valid escrow agreement and established a fiduciary relationship between plaintiff and the Crocker Defendants.

C.    Misconduct by the Defendant

Plaintiff argues Crocker engaged in misconduct when he prematurely released the initial deposit funds from escrow in violation of the Original SPA. (Doc. #194 at 32). The Crocker Defendants counter that summary judgment in their favor is warranted because plaintiff authorized or otherwise ratified Crocker's release of the funds, thus waiving its breach of fiduciary duty claim. (Doc. #204 at 5–9).

"An escrow agreement may be mutually abandoned by the parties to it, and abandonment need not be marked with formality equal to that used in establishing escrow." George A. Fuller Co. v. Alexander & Reed, Esqs., 760 F. Supp. 381, 387 (S.D.N.Y. 1991). Accordingly, even absent an express waiver, a court may consider whether the parties acted "in a manner inconsistent with the terms of the escrow agreement and thereby abandoned it." Id.

---

edited the Original SPA "by adding or [] by removing some portion of this agreement as it exists in its final form." (Docs. ##205 at ¶ 80, #184–4 at Tr. 198–201).

[9]    The Crocker Defendants rely on Del Valle's deposition testimony that he understood Crocker to be "Regeneveda's escrow attorney." (Doc. #204 at 11) (emphasis added). They urge the Court to take this as an admission Crocker owed no fiduciary duty to plaintiff. (Id.). This statement is taken out of context. Del Valle correctly believed Crocker to be Regeneveda's attorney, but he unambiguously testified Crocker was "the escrow agent for the transaction." (Doc. #184–1 at Tr. 195).

Here, the Crocker Defendants point to ample evidence showing plaintiff abandoned the escrow agreement and authorized or otherwise ratified Crocker's release of the initial deposit funds. First, Listo testified the purpose of the initial deposit was to have the funds sent to Canchi to initiate the SGS inspection. (Doc. #184–3 at Tr. 107–09). Listo also forwarded to Del Valle two letters from Banfill. The first letter, sent January 18, 2022, four days after the initial deposit, states Canchi received "the partial prepayment wire" to its bank account. (Doc. #195–9 at 2). The second letter, sent two days later on January 20, again discusses "deposit monies" which had been wired to China. (Doc. #195–10 at 2). On January 23, after receiving these letters, plaintiff executed the Amended SPA, which included the following language:

> The Parties hereby confirm Seller received Seven Million Eighty Thousand US Dollars ($7,080,000) from Buyer . . . . Immediately upon acceptance of the SGS and Airway Bill, the Buyer will authorize the Escrow Agent to release funds held in the Escrow Account to Canchi for <u>further</u> payment of the Goods.

(Doc. #184–16 at 2) (emphasis added). From this, a reasonable jury could find plaintiff was aware the initial deposit funds had been released to Canchi, and plaintiff nonetheless elected to continue the transaction.

To be sure, plaintiff also offers substantial evidence showing it was unaware of Crocker's release of the initial deposit funds and did not otherwise ratify his action. The letters from Banfill do not indicate that the funds mentioned came from M&K or even from Crocker's escrow account. (Docs. ##195–9, 195–10); <u>see also</u> (Doc. #184–3 at Tr. 184–86). And Del Valle testified he believed these letters had nothing to do with plaintiff's deposit but instead referenced separate dealings between Regeneveda and Canchi. (Doc. #200 at 7–8). He further testified he believed the initial deposit was still in Crocker's escrow account at the time he signed the Amended SPA. (Doc. #184–1 at Tr. 145). Plaintiff also emphasizes inconsistencies in Listo's testimony and urges the Court to ignore it as "fabricated." (Doc. #198 at 7).

16

But weighing the evidence and making credibility determinations are beyond the Court's role in deciding the instant motions—those are jury functions.  Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545–46 (2d Cir. 2010).  Here, there is a genuine dispute of material fact as to whether plaintiff authorized or otherwise ratified Crocker's transfer of the initial deposit.  Accordingly, summary judgment in favor of either party is improper.  Hueblein, Inc. v. United States, 996 F.2d at 1461.

IV.    Aiding and Abetting Breach of Fiduciary Duty Claim

Plaintiff contends it is entitled to summary judgment on its claim against the Seller Defendants for aiding and abetting the Crocker Defendants' breach of fiduciary duty.  (Doc. #183).

The Court disagrees.

The elements of a claim for aiding and abetting a breach of fiduciary duty are "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 294 (2d Cir. 2006).

Here, plaintiff's claim for aiding and abetting breach of fiduciary duty is based upon the Seller Defendants' role in directing Crocker's release of the initial deposit funds from his escrow account.  As detailed above, there is a genuine dispute of material fact as to whether Crocker breached his fiduciary duty to plaintiff.  Thus, a reasonable jury could find for the Seller Defendants on the first element of plaintiff's aiding and abetting claim.  Accordingly, plaintiff is not entitled to summary judgment on this claim.[10]

---

[10]    The Court pauses to address the Seller Defendants' argument that all claims against Lobe individually should be "dismissed" because this Court has already dismissed plaintiff's alter ego theory and Lobe did not commit any affirmative acts in his individual capacity.  (Doc. #206 at 5–

V.    <u>Negligence Claim</u>

Plaintiff argues it is entitled to summary judgment on its negligence claim against the Crocker Defendants.  The Crocker Defendants contend summary judgment in their own favor is proper because Crocker did not breach any duty owed to plaintiff.

The Court finds neither party is entitled to summary judgment.

The elements of a negligence claim are "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach."  <u>Pasternack v. Lab Corp. of Am. Holdings</u>, 807 F.3d 14, 19 (2d Cir. 2015).

Plaintiff's negligence claim is again based on Crocker's allegedly premature release of a portion of the initial deposit funds.  As detailed above, there is a genuine dispute of material fact as to whether plaintiff authorized or otherwise ratified Crocker's transfer of the initial deposit funds, and thus a reasonable jury could find for either party on the breach element of the negligence claim. [11]  Accordingly, neither party is entitled to summary judgment on this claim.

---

7).  This argument is meritless for two reasons.  First, although the Court previously dismissed plaintiff's breach of contract claim against Lobe for failure to allege facts supporting a piercing of the corporate veil, it did not rule on whether Lobe acted in his individual capacity or on behalf of Regeneveda when instructing the release of the initial deposit funds.  (Doc. #63 at 8, 14).  Second, the Seller Defendants have not moved for summary judgment, and the Court will not now "dismiss" plaintiff's claims against Lobe on this basis.  This ruling is without prejudice to the Seller Defendants making this argument in a motion pursuant to Federal Rule of Civil Procedure 50(a) at trial.

[11]      In support of its motion, plaintiff attached the report of Dr. Aman McLeod, who opined Crocker violated Michigan rules of professional conduct.  The Crocker Defendants argue this report should be stricken because, pursuant to a stipulation by the parties, the Court ordered all claims and issues asserted or raised in this case shall be governed by New York law.  (Doc. #168).  Plaintiff agrees.  (Doc. #198 at 15).  Accordingly, the Court will not consider Dr. McLeod's report.

VI.    <u>Conversion Claim</u>

Plaintiff argues it is entitled to summary judgment on its claim against all defendants for conversion.  The Seller Defendants oppose plaintiff's motion, and the Crocker Defendants contend summary judgment in their own favor is proper because plaintiff authorized or otherwise ratified Crocker's transfer of the initial deposit funds.

The Court finds no party is entitled to summary judgment.

"In New York, conversion occurs when a defendant exercises unauthorized dominion over personal property in interference with plaintiff's legal title or superior right of possession." <u>Newbro v. Freed</u>, 409 F. Supp. 2d 386, 394 (S.D.N.Y. 2006).  "[A]n unauthorized wire transfer from one bank account to another constitutes conversion." <u>Id</u>. at 395.  "[A]ctual consent or acquiescence is a complete defense to a claim of conversion."  <u>In re CIL Limited</u>, 582 B.R. 46, 115 (Bankr. S.D.N.Y. 2018) (citing <u>Knight v. Del. & Hudson Co.</u>, 178 A.D. 518, 519 (1st Dep't 1917)).

Plaintiff's conversion claim is based on Crocker's release of the initial deposit funds and the Seller Defendants' role in directing Crocker's actions.  Once again, there is a genuine dispute of material fact as to whether plaintiff authorized or acquiesced to the release of the initial deposit funds.  Accordingly, neither plaintiff nor the Crocker Defendants are entitled to summary judgment on this claim. [12]

_____

[12]    The Seller Defendants argue the Court should "dismiss" plaintiff's conversion claim because the allegedly converted funds belonged to plaintiff's private investor, SBC—not plaintiff, and only Crocker exercised dominion over the funds.  (Doc. #206 at 9–13).  Again, the Court notes the Seller Defendants have not moved for summary judgment.  Additionally, because the Seller Defendants did not submit a counterstatement pursuant to Local Civil Rule 56.1(b), it is undisputed that "[n]otwithstanding that [SBC] wired the funds directly to the Escrow Account, the funds did come from M&K Imports."  (Doc. #186 at 11).  Plaintiff's allegations regarding the Seller Defendants' involvement in Crocker's release of the funds are similarly deemed admitted

VII.    <u>The Seller Defendants' Crossclaim</u>

Finally, the Crocker Defendants contend they are entitled to summary judgment on the Seller Defendants' crossclaim for contribution and indemnity.  (Doc. #196 at 8).  Specifically, the Crocker Defendants argue the escrow agreement in the Canchi SPA contains a broad limitation of liability absent bad faith, which the Seller Defendants have not alleged.  (<u>Id</u>.); <u>see also</u> (Doc. #184–41 at 8).  The Seller Defendants do not so much as acknowledge this argument in their opposition papers.  (<u>See</u> Doc. #206).  A party's claim is deemed abandoned when it fails to address arguments in opposition papers on a summary judgment motion.  <u>Senno v. Elmsford Union Free Sch. Dist.</u>, 812 F. Supp. 2d 454, 468 (S.D.N.Y. 2011).  Accordingly, the Crocker Defendants are entitled to summary judgment on the Seller Defendants' crossclaim, and the crossclaim is dismissed.

## CONCLUSION

Plaintiff's motion is GRANTED IN PART and DENIED IN PART.

The Crocker Defendants' motion is GRANTED IN PART and DENIED IN PART.

To summarize: (i) plaintiff is entitled to summary judgment on its claim against Regeneveda for breach of contract, and Regeneveda is liable to plaintiff in the total amount of $17,560,000; (ii) neither plaintiff nor the Crocker Defendants is entitled to summary judgment on plaintiff's claim for breach of fiduciary duty; (iii) plaintiff is not entitled to summary judgment on its claim against the Seller Defendants for aiding and abetting the Crocker Defendants' breach of fiduciary duty; (iv) neither plaintiff nor the Crocker Defendants is entitled to summary judgment on plaintiff's negligence claim; (v) neither plaintiff nor the Crocker

_____

for the purposes of plaintiff's motion.  (<u>Id</u>. at 11–14).  This ruling is without prejudice to the Seller Defendants making this argument in a Rule 50(a) motion at trial.

Defendants is entitled to summary judgment on plaintiff's conversion claim; and (vi) the Crocker Defendants are entitled to summary judgment on the Seller Defendants' crossclaim for contribution and indemnity.

In short, plaintiff's breach of contract claim against Regeneveda is resolved in plaintiff's favor. All of plaintiff's other claims are unresolved and remain pending. The Seller Defendants' crossclaim against the Crocker Defendants is dismissed.

The Court will conduct a case management conference on January 13, 2026, at 11:00 a.m., to be held at the White Plains courthouse, Courtroom 620, at which time counsel shall be prepared to discuss, among other things, the setting of a trial date and a schedule for pretrial submissions, as well as what good faith efforts they have made and will continue to make to settle this case. To be clear, all counsel are directed to discuss settlement in good faith prior to that date.

The Clerk is instructed to terminate the motions. (Docs. ##183, 188).

Dated:  December 9, 2025
        White Plains, NY

                                SO ORDERED:

                                _____
                                Vincent L. Briccetti
                                United States District Judge

21